## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| DANNY F. WILLIAMS, as the surviving son of decedent, MARINE A WILLIAMS, and Danny F. Williams as Independent Administrator of the ESTATE OF MARINE A WILLIAMS | Case No.  1:23-cv-00157-SNLJ |
| Plaintiffs, | JURY TRIAL DEMANDED |
| v. | |
| NHC HEALTHCARE/KENNETT, LLC; NATIONAL HEALTH CORPORATION; AND NATIONAL HEALTHCARE CORPORATION | |
| Defendants. | |

### PLAINTIFFS' AMENDED COMPLAINT

The Plaintiffs, by and through undersigned counsel, submit this Amended Complaint for Damages against the above-named Defendants, and in further support, states and alleges as follows:

### PLAINTIFF

1.     Marine A. Williams ("Resident") died on November 22, 2021, from an avoidable pressure ulcer and infection developed at NHC Healthcare/Kennett, LLC Healthcare and Rehabilitation Center, a Missouri skilled nursing facility located at 1120 Falcon, Kennett, MO 63857 ("The Facility).

2.     Plaintiff, Danny F. Williams, is, and always relevant hereto, an adult over the age of 21 and a citizen of the state of Missouri.

3.     Decedent Marine A. Williams was a citizen of the state of Missouri at the time of her death.

4.      Danny F. Williams is the duly appointed Administrator of the Estate of Marine A. Williams pursuant to an order entered January 26, 2023, by the Dunklin County Circuit Court, case number 22DUPR00125.

5.      Decedent Marine A. Williams was a citizen of the state of Missouri at the time of her death.

6.      The Estate of Marine A. Williams a citizen of the state of Missouri.  28 U.S.C. § 1332(c)(2).

7.      Danny F. Williams is a surviving child of Resident, and therefore, a member of the class of individuals authorized to pursue a wrongful death claim pursuant to RSMo. § 537.080.

## DEFENDANTS

8.      Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

## NHC HEALTHCARE/KENNETT, LLC

9.      At all times relevant, NHC HEALTHCARE/KENNETT, LLC was a Missouri limited liability company and owned, operated, managed, maintained, and/or controlled, in whole or in part, and did business as NHC HEALTHCARE/KENNETT, LLC ("Facility" or "the Facility") which is a Missouri licensed nursing home located at 1120 Falcon, Kennett, MO 63857.

10.     As such, NHC HEALTHCARE/KENNETT, LLC was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling NHC HEALTHCARE/KENNETT, LLC.

11.     Consequently, NHC HEALTHCARE/KENNETT, LLC, owed a duty to Resident to use reasonable care for Resident's safety while under the care and supervision at NHC HEALTHCARE/KENNETT, LLC.

## NATIONAL HEALTHCARE CORPORATION

12.     NATIONAL HEALTHCARE CORPORATION was incorporated in Delaware and its principal place of business is in Tennessee.

13.     NATIONAL HEALTHCARE CORPORATION has been always  relevant to  this action a citizen of Delaware and Tennessee.

14.     NATIONAL HEALTHCARE CORPORATION was substantially engaged in the leasing, control, management, staffing, fiscal budgeting, oversight, risk management, regulatory compliance, implementation and enforcement of policies and procedures, consultation with and/or operation of the licensee, NHC HEALTHCARE/KENNETT, LLC by exercising final authority over (1) staffing budgets; (2) the development and implementation of nursing policies and procedures; (3) the hiring and firing of the administrator; (4) appointing the governing body that is legally responsible for establishing and implementing policies regarding the management and operation of NHC HEALTHCARE/KENNETT, LLC.

15.     These actions and decisions had a direct impact on the care provided to all residents including Resident and caused the injuries at issue in this lawsuit.

16.     Moreover, NATIONAL HEALTHCARE CORPORATION operated, managed, maintained, and/or controlled NHC HEALTHCARE/KENNETT, LLC by binding the nursing home to contracts with related parties – as defined by the Centers for Medicare and Medicaid Services – for dollar amounts that far exceeded the fair value of those services and resulted in funds being diverted out of NHC HEALTHCARE/KENNETT, LLC that could and should have been utilized to hire enough nursing staff.

17.     According to NATIONAL HEALTHCARE CORPORATION: "Our principal business is the operation of skilled nursing facilities, assisted living facilities, independent living facilities, homecare and hospice agencies, and a behavioral health hospital. Our business activities include providing subacute and post-acute skilled nursing care, intermediate nursing care, rehabilitative care, memory and Alzheimer's care, senior living services, home health care services, hospice services, and behavioral health services."

18.     According to NATIONAL HEALTHCARE CORPORATION: "The most significant portion of our business and the base for our other health care services is the operation of our skilled nursing facilities ("SNF's"). In our facilities, experienced medical professionals provide medical services prescribed by physicians. Registered nurses, licensed practical nurses, and certified nursing assistants provide comprehensive, individualized nursing care 24 hours a day. In addition, our facilities provide licensed therapy services, quality nutrition services, social services, activities, and housekeeping and laundry services. Revenues from the 66 facilities we own or lease are reported as net patient revenues in our financial statements."

19.    According to NATIONAL HEALTHCARE CORPORATION: "Centers for Medicare and Medicaid Services ("CMS") introduced the Five-Star Quality Rating System to help consumers, their families and caregivers compare skilled nursing facilities more easily. The Five-Star Quality Rating System gives each skilled nursing operation a rating of between one and five stars in various categories (five stars being the best). The Company has always strived for patient-centered care and quality outcomes as precursors to outstanding financial performance."

20.    According to NATIONAL HEALTHCARE CORPORATION: "The Company has two reportable operating segments: (1) inpatient services, which includes the operation of skilled nursing facilities, assisted and independent living facilities, and the one behavioral health hospital, and (2) homecare and hospice services."

21.    According to NATIONAL HEALTHCARE CORPORATION: "In most of the communities in which we operate health care facilities, we compete with other health care facilities in the area. There are hundreds of operators of post-acute healthcare services in each of these states and no single operator, including us, dominates any of the markets, except for some small rural markets which might have limited competition. In competing for patients and staff, we depend upon referrals from acute care hospitals, physicians, residential care facilities, church groups and other community service organizations. The reputation in the community and the physical appearance of our facilities are important in obtaining patients since members of the patient's family generally participate to a greater extent in selecting skilled nursing facilities than in selecting an acute care hospital. We believe that by providing and emphasizing rehabilitative,

as well as patient-centered healthcare services, we can broaden our patient base and to differentiate our operations from competing operations."

22.    According to NATIONAL HEALTHCARE CORPORATION: "As of December 31, 2021, we had 12,965 full-time and part-time employees ("partners") through our Administrative Services Contractor (National Health Corporation)."

23.    According to NATIONAL HEALTHCARE CORPORATION: "To attract and retain top talent, we believe we must offer and maintain competitive total rewards for our partners. These rewards include not only wages and salaries, but also health, welfare, and retirement benefits. Our partners accrue earned time off ("ETO") with the flexibility to use this time at their discretion. We offer comprehensive health insurance coverage to all eligible partners as well as a partner and family sick time program which allows partners to accrue paid sick time based on hours worked and to use that time for themselves or family members in need of care. We offer a 401(k) plan which includes matching company contributions. Also, to foster a stronger sense of ownership, we offer an Employee Stock Purchase Plan where partners may purchase company stock through payroll deduction."

24.    According to NATIONAL HEALTHCARE CORPORATION: "We also conduct an "Administrator in Training" course, which is 24 months in duration, for the professional training of administrators. Presently, we have five (two female and three male) full-time individuals in this program. Both of our regional senior vice presidents, four regional vice presidents, one regional administrator, and 53 of our 75 health care center administrators are graduates of this program."

25.     According to NATIONAL HEALTHCARE CORPORATION: "We regularly utilize third-party consultants to conduct anonymous surveys to seek feedback from our partners on a variety of topics, including but not limited to, confidence in company leadership, competitiveness of our compensation and benefits package, career growth opportunities and improvements on how we can continue to make our company an employer of choice. The results are shared with our partners and reviewed by senior leadership, who analyze areas of progress or deterioration and prioritize actions and activities in response to this feedback to drive meaningful improvements in partner engagement."

26.     According to NATIONAL HEALTHCARE CORPORATION: "A primary area of management focus continues to be the rates of occupancy within our skilled nursing facilities. The overall census in owned and leased skilled nursing facilities for 2021 was 80.6% compared to 83.6% in 2020 and 90.3% in 2019."

27.     According to NATIONAL HEALTHCARE CORPORATION: "With the average length of stay decreasing for a skilled nursing patient, as well as the increased availability of assisted living facilities and home and community-based services, the challenge of maintaining desirable patient census levels has been amplified. Management has undertaken a number of steps in order to best position our current and future health care facilities. This includes working internally to examine and improve systems to be most responsive to referral sources and payors. Additionally, NHC is in various stages of partnerships with hospital systems, payors, and other post-acute alliances to better position ourselves so we are an active participant in the delivery of post-acute healthcare services."

28.     These actions and business decisions had a direct impact on the care provided to all residents including Resident and caused the injuries at issue in this lawsuit.

29.     Consequently, NATIONAL HEALTHCARE CORPORATION owed a duty to Resident to use reasonable care for Resident's safety while under her care and supervision at NHC HEALTHCARE/KENNETT, LLC.

## NATIONAL HEALTH CORPORATION

30.     NATIONAL HEALTH CORPORATION was incorporated in Tennessee and its principal place of business is in Tennessee.

31.     NATIONAL HEALTH CORPORATION has been always  relevant to this action a citizen of Tennessee.

32.     At all times relevant to this action, NATIONAL HEALTH CORPORATION, employed each employee, officer, and director at NHC HEALTHCARE/KENNETT, LLC and NATIONAL HEALTHCARE CORPORATION.

33.     Consequently, NATIONAL HEALTH CORPORATION owed a duty to Resident to use reasonable care for Resident's safety while under its care and supervision at NHC HEALTHCARE/KENNETT, LLC and breached said duty for all the reasons stated in this Complaint.

## DEFENDANTS' JOINT ENTERPRISE/VENTURE

34.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

35.     Defendants NHC HEALTHCARE/KENNETT, LLC, NATIONAL HEALTHCARE CORPORATION, and NATIONAL HEALTH CORPORATION ("Joint Venture Defendants") were engaged in a joint venture in that:

    a.   The Joint Venture Defendants had an agreement, express and/or implied, among the members of the group to operate NHC HEALTHCARE/KENNETT, LLC, a Missouri licensed nursing home;

    b.   The Joint Venture Defendants had had a common purpose to operate NHC HEALTHCARE/KENNETT, LLC, a Missouri licensed nursing home;

    c.   The Joint Venture Defendants had a community of pecuniary interest in the operation of NHC HEALTHCARE/KENNETT, LLC, a Missouri licensed nursing home; and

    d.   The Joint Venture Defendants had had an equal right to a voice in the direction of the operation of NHC HEALTHCARE/KENNETT, LLC, a Missouri licensed nursing home.

36.     There has been always a close relationship between the Joint Venture Defendants relevant.

37.     Because of the joint venture, the Joint Venture Defendants owed a joint duty to Resident to use reasonable care for their safety while under their care and supervision at NHC HEALTHCARE/KENNETT, LLC.

## JURISDICTION AND VENUE

38.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

39.     The only member of the limited liability company NHC HEALTHCARE/KENNETT, LLC is NATIONAL HEALTHCARE CORPORATION.

40.     NATIONAL HEALTHCARE CORPORATION is a citizen of Delaware and Tennessee

41.     Thus, NHC HEALTHCARE/KENNETT, LLC is a citizen of the states of Delaware and Tenessee by way of its member being citizens of the states of Delaware and Tennessee.

42.     NATIONAL HEALTH CORPORATION is a Tennesse corporation with its principal place of business in Tennessee.

43.     Thus, NATIONAL HEALTH CORPORATION is a citizen of the state Tennessee

44.     Plaintiff is is a citizen of Missouri

45.     Decedent was a citizen of the state of Missouri at the time of her death.

46.     Therefore, Plaintiff brings her claims contained in the Complaint under federal diversity jurisdiction, 28 U.S.C. § 1332(a)(1), as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

47.     Pursuant to RSMo § 506.500.1(3), defendants, purposefully availed themselves of the protections and/or benefits of the laws in Missouri by committing tortious acts within the state including, but not limited to, failing to ensure that NHC HEALTHCARE/KENNETT, LLC had appropriate policies and procedures for its nursing staff, was properly capitalized, funded, staffed, and that staff received adequate training and supervision, thereby making jurisdiction proper in this Court.

48.     A substantial part of the events or omissions giving rise to the claims described in the Complaint occurred in this District of Missouri, thereby making venue proper in this Court.

## AGENCY

49.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

50.     The acts hereinafter described were performed by the agents, representatives, servants, and employees of Defendants and were performed either with the full knowledge and consent of Defendants, and/or were performed by their agents, representatives, servants, or employees during the scope of their agency, representation, or employment with the Defendants.

51.     Furthermore, the acts hereinafter described as being performed by the agents, representatives, servants, or employees of Defendants were performed or were supposed to be performed on behalf of and/or for the benefit of Resident.

## FACTUAL BACKGROUND

52.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

### Defendants' Treatment of Resident

53.     Upon admission to NHC HEALTHCARE/KENNETT, LLC, Resident was at risk for developing skin breakdown, and pressure ulcers.

54.     Failure of Nhc Healthcare/Kennett, LLC staff to offload Ms. Williams' sacral/coccyx and heels areas caused development and progression of pressure injuries in these areas. The pressure applied to the heels and sacrum/coccyx area exceeded the tissue tolerance to pressure.

55.     Skin subjected to prolonged contact with urine and feces is more likely to break down.

56.     The sacral/coccyx pressure injury became infected, requiring hospitalization and antibiotic treatment. Sacral pressure injury infection resulted in severe sepsis/bacteremia.

57.     None of NHC HEALTHCARE/KENNETT, LLC staff, nor any other defendants conducted a Resident assessment to identify Resident's risk of developing skin breakdown.

58.     Despite Resident's risk, upon information and belief none of NHC HEALTHCARE/KENNETT, LLC staff, nor any other defendants implemented a Care Plan to address Resident's risk of developing a pressure ulcer nor did they implement a turning and repositioning program to offload the pressure on Resident's skin.

59.     Upon information and belief, none of NHC HEALTHCARE/KENNETT, LLC staff:

    a.  Properly assessed Resident's developing skin breakdown or pressure ulcers;

    b.  Implemented or provided the appropriate interventions to prevent Resident from developing a pressure ulcer or allowing Resident's pressure ulcer to get worse, including turning or repositioning Resident to offload the pressure on Resident's skin;

    c.  Monitored or evaluated Resident's Care Plan to see if the interventions prescribed were working; or

    d.  Monitored Resident's urine, skin condition, including Resident's pressure ulcer or measure its size during this time frame.

60.     Upon information and belief, at no point while Resident was a resident at NHC HEALTHCARE/KENNETT, LLC did any of NHC HEALTHCARE/KENNETT, LLC management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from NHC HEALTHCARE/KENNETT, LLC, NATIONAL HEALTHCARE CORPORATION, NATIONAL HEALTH CORPORATION or any other staff member ever provide any sort of in-service training or clinical education to NHC HEALTHCARE/KENNETT, LLC staff regarding the assessment, prevention, use of interventions, monitoring, and reporting of pressure ulcer or skin breakdown in residents like Resident.

61.     Upon information and belief, at no point while Resident was a resident at NHC HEALTHCARE/KENNETT, LLC did any of NHC HEALTHCARE/KENNETT, LLC management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from NHC HEALTHCARE/KENNETT, LLC, NATIONAL HEALTHCARE CORPORATION, and NATIONAL HEALTH CORPORATION or any other staff member ever implement the appropriate policies and procedures at NHC HEALTHCARE/KENNETT, LLC regarding the assessment, prevention, use of interventions, monitoring, and reporting of pressure ulcer in residents like Resident.

62.     Upon information and belief, while Resident was a resident at NHC HEALTHCARE/KENNETT, LLC, NHC HEALTHCARE/KENNETT, LLC did not have an adequate number of staff working daily at NHC HEALTHCARE/KENNETT, LLC to meet Resident's needs, perform the interventions required to prevent Resident's avoidable pressure ulcer or prevent the progression of Resident's pressure ulcer, or monitor and adequately supervise Resident's condition.

### Cost Reporting & Staffing Information

63.     Nursing facilities, like NHC HEALTHCARE/KENNETT, LLC, are required to submit an annual "Cost Report" to CMS, known as "CMS Form 2540-10". The cost report is a financial report that identifies the cost and charges related to healthcare treatment activities in a particular nursing facility.

64.     Included with the cost reports are extensive details as to how much money the nursing facility spent on RNs, LPNs, and CNAs. The cost reports reflect the patient census, hours paid, and the hourly rate that the nursing facility paid each category of direct caregivers.

65.     By dividing the paid hours by the patient census in the facility it is possible to determine how many hours the nursing facility paid for each category of direct caregivers per resident per day for the period covered by that cost report. This number is referred to as the "reported HPPD".

66.     CMS allows the facilities to include all paid hours in the "reported HPPD."  Thus, that number does reflect true direct care hours, but is inflated because "hours paid" includes sick pay and vacation pay both of which reduce the amount of actual HPPD provided by caregivers to residents in nursing facilities.

67.     NHC HEALTHCARE/KENNETT, LLC was also required to report quarterly staffing information through the CMS "Payroll Based Journal" (PBJ) program.

68.     To determine more accurate direct-care hours, it is necessary to examine the data that nursing facilities use to track the number of hours their employee's work.  This information is easily accessed through reports that are commonly referred to as "Time Detail Reports", "Punch Detail Data Reports", or some other similarly named report depending on the time-keeping system used by the nursing facility.

69.     The more detailed Punch Detail or time records will note vacation or sick time paid and thus, reveal actual hours worked in the facility.  This information reveals a more accurate direct care number and allows the calculation of the actual HPPD for any period including a year, a quarter, a month, or a day.

70.     Upon information and belief, the staffing levels reported by NHC HEALTHCARE/KENNETT, LLC skilled nursing & therapy for the period Resident was at NHC HEALTHCARE/KENNETT, LLC were below the CMS expected levels derived from the MDS RUG rates which reflect actual acuity and not simply a resident census.

71.     Upon information and belief, the staffing levels reported by NHC HEALTHCARE/KENNETT, LLC skilled nursing & therapy for the period Resident was at NHC HEALTHCARE/KENNETT, LLC were below the CMS expected levels derived from the MDS RUG rates which reflect actual acuity and not simply a resident census.

### Undercapitalization/Underfunding at NHC HEALTHCARE/KENNETT, LLC

72.     NATIONAL HEALTH CORPORATION, NATIONAL HEALTHCARE CORPORATION, and NHC HEALTHCARE/KENNETT, LLC had a duty to provide financial resources and support to NHC HEALTHCARE/KENNETT, LLC in a manner that would ensure that each of their residents received the necessary care and services and attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with their residents' comprehensive assessments and plans of care.

73.     NATIONAL HEALTH CORPORATION, NATIONAL HEALTHCARE CORPORATION, and NHC HEALTHCARE/KENNETT, LLC had a duty to provide sufficient financial resources to ensure there was enough properly trained and supervised staff to meet the needs of their residents.

74.     Upon information and belief, NHC HEALTHCARE/KENNETT, LLC had no autonomy to decide their own financial course, including no authority to determine how much staff they could provide or what resources were available to the staff.

75.     Upon information and belief, no individuals at NHC HEALTHCARE/KENNETT, LLC are involved in decision making about the financial operations or what its resources were and where they would be spent.

76.     Transactions directed by NATIONAL HEALTHCARE CORPORATION, and NATIONAL HEALTH CORPORATION left NHC HEALTHCARE/KENNETT, LLC with insufficient cash to provide sufficient qualified staff to meet the individual needs of the residents in their NHC HEALTHCARE/KENNETT, LLC during Resident's time there.

### LEGAL BASIS FOR NATIONAL HEALTHCARE CORPORATION AND NATIONAL HEALTH CORPORATION'S LIABILITY

#### Joint Venture/Enterprise

77.     NATIONAL HEALTHCARE CORPORATION, and NATIONAL HEALTH CORPORATION are collectively referred to herein as the "Corporate Defendants."

78.     The Corporate Defendants directed, operated, and managed the day-to-day functions of their nursing facilities – including NHC HEALTHCARE/KENNETT, LLC – by developing and implementing policies, practices and procedures affecting all facets of NHC HEALTHCARE/KENNETT, LLC, including resident care.

79.     These policies manipulate and control the physical and financial resources, and prohibit decision making at NHC HEALTHCARE/KENNETT, LLC level.

80.     This directly affects resident care by determining things such as what type and quality of nourishment is available for residents; what safety measures may and may not be used depending upon cost; the integrity of the building itself; and most importantly, how much staff is available to provide resident care and how well trained and supervised are the staff to meet the needs of the residents.

81.     These policies and practices were developed and implemented without regard to the needs of the residents and, in fact, mandated the reckless disregard for the health and safety of NHC HEALTHCARE/KENNETT, LLC's residents.

82.     The Corporate Defendants affirmatively chose and decided to establish such operations and demand they be implemented.

83.     Upon information and belief, such operations included, *inter alia*, the following dangerous policies and practices: (a) the aggressive recruitment and admission of high acuity patients to increase the patient census when Defendants had already chosen to understaff NHC HEALTHCARE/KENNETT, LLC and continually maintain a staff that were not qualified nor competent to provide the care required by state law, regulations and minimum standards of the medical community; and (b) the decision to retain residents whose needs exceeded the qualification and care capability of NHC HEALTHCARE/KENNETT, LLC's staff.

84.     The Corporate Defendants consciously chose not to implement safety policies, procedures and systems which would ensure that: (a) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (b) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

85.     The Corporate Defendants, conduct themselves in a manner which indicates a joint venture/enterprise amongst them, to wit:

    a.  The shared interest in the operation and management of nursing facilities;

    a.  The express and implied agreements amongst them to share in the profits and losses of such venture/enterprise; and

b. The obvious actions taken showing the cooperation in furthering the venture/enterprise operating and managing nursing facilities.

86.     Missouri law recognizes a joint venture/enterprise where the parties alleged to be partners in such venture/enterprise share a common interest in the property or activity or the joint venture; maintain agreements, either express or implied, to share in profits or losses of the venture/enterprise; and express actions or conduct showing cooperation in the project of the venture/enterprise.

87.     The Corporate Defendants share a common interest in the operation and management of nursing facilities, including NHC HEALTHCARE/KENNETT, LLC; maintain agreements to share in the profits or losses of the operation of nursing facilities described herein; and operate daily evincing conduct which indicates their cooperation in the venture of operating and managing nursing facilities for profit.

88.     The Corporate Defendants and NHC HEALTHCARE/KENNETT, LLC took direct, overt, and specific actions to further the interest of the joint enterprise.

89.     These actions were taken through a joint venture/enterprise or through the Corporate Defendants and NHC HEALTHCARE/KENNETT, LLC's officers, directors, managers and or employees.

90.     The Corporate Defendants had an equal right to share in the profits and to bear liability for, the joint venture/enterprise.

91.     Further,      because      the      Corporate      Defendants      and      NHC HEALTHCARE/KENNETT, LLC were dominated by each other, these entities had an equal right to direct or control their venture, as well as to direct or control the operation and management of NHC HEALTHCARE/KENNETT, LLC.

**Direct Participation/Individual Actions**

92.     The Corporate Defendants were always material to this lawsuit in the business of managing, owning, and operating a network of nursing homes throughout the State of Missouri. One such nursing home was NHC HEALTHCARE/KENNETT, LLC where Resident was admitted for care and treatment.

93.     At all times material to this lawsuit, the Corporate Defendants were fully aware that the delivery of essential care services in each of their nursing homes – including NHC HEALTHCARE/KENNETT, LLC – hinged upon three fundamental fiscal and operational policies which were dictated by their choices on establishing and implementing such policies: (1) the determination of the numbers and expenditures on staffing levels; (2) the determination of the census levels within the nursing home; and, (3) payor mix.

94.     At all times material, the Corporate Defendants made critical operational decisions and choices which manipulated and directly impacted NHC HEALTHCARE/KENNETT, LLC's revenues, and expenditures.  More particularly, the Corporate Defendants determined:

    a.  The number of staff allowed to work in their chains of nursing homes including NHC HEALTHCARE/KENNETT, LLC;

    b.  The expenditures for staffing at the nursing homes including NHC HEALTHCARE/KENNETT, LLC;

     c.   The revenue targets for each nursing home including NHC HEALTHCARE/KENNETT, LLC;

     d.   The payor mix, and census targets for each nursing home including NHC HEALTHCARE/KENNETT, LLC;

     e.   Patient recruitment programs and discharge practices at each nursing home including NHC HEALTHCARE/KENNETT, LLC.

95.     All cash management functions, revenues and expenditure decisions at the nursing home level – including NHC HEALTHCARE/KENNETT, LLC – were tightly managed, directed, and supervised by the Corporate Defendants.

96.     It was the choices made by the Corporate Defendants which directly fixed the circumstances in the facilities and the level of care that could, and was, provided at the homes, including NHC HEALTHCARE/KENNETT, LLC.

97.     The Corporate Defendants formulated, established, and mandated the application and implementation of the policies regarding the staffing levels and expenditures, the census levels, and payor mix.

98.     The census edicts, marketing and admission practices, and resident discharge policies designed and mandated by the Corporate Defendants were implemented and such application was carefully supervised and enforced.

99.     Following the mandates, NHC HEALTHCARE/KENNETT, LLC functioned in accordance with them, filling empty beds, recruiting high acuity patients, and maintaining a census level and staffing level established and enforced as the Corporate Defendants deemed appropriate.

100.     Accordingly, such manipulation by the Corporate Defendants as to staffing and census were motivated by the financial needs of the Corporate Defendants and NHC HEALTHCARE/KENNETT, LLC as opposed to the acuity levels and needs of the residents as dictated by state and federal laws and regulations.

101.     Instead of abiding by their duty to care for the residents, the Corporate Defendants chose to be guided by financial motivation which was simply to increase revenues while restricting and/or reducing expenses.

102.     The Corporate Defendants, therefore, directly participated in a continuing course of negligent conduct, requiring NHC HEALTHCARE/KENNETT, LLC to recruit and retain heavier care, higher pay residents to NHC HEALTHCARE/KENNETT, LLC even though the needs of the patient population far exceeded the capacity of staff.

103.     At the same time, the Corporate Defendants chose to design, create, implement, and enforce operational budgets at NHC HEALTHCARE/KENNETT, LLC which dictated the level of care that could be provided and therefore deprived residents care, creating widespread neglect.

104.     In so doing, the Corporate Defendants disregarded, superseded, and violated the duties and responsibilities imposed on a licensed nursing home, in this case NHC HEALTHCARE/KENNETT, LLC, by the State of Missouri, and the federal government.

## Corporate Malfeasance

105.    The Corporate Defendants consciously chose not to implement safety policies, procedures and systems which would ensure that: (1) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (2) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

106.    Accordingly, the Corporate Defendants, by their operational choices and decision making, and to satisfy their desire to grow profits, created a dangerous condition that caused harm to residents.

107.     These choices to establish and implement such policies and the conscious decision not to implement corrective actions or procedures disregarded the duties which the State of Missouri and federal government imposed upon the Corporate Defendants and NHC HEALTHCARE/KENNETT, LLC.

108.    Because the staffs were below necessary levels, and because the staffs that were present were not properly qualified or trained, the residents at NHC HEALTHCARE/KENNETT, LLC including Resident, failed to receive even the most basic care required to prevent catastrophic injury and death.  This negligence and resulting injuries ultimately led to and caused Resident's injuries and death as described above.

109.    During Resident's residency at NHC HEALTHCARE/KENNETT, LLC, Resident sustained physical injuries and died, as described in more detail above, because of the acts, omissions, decisions, and choices made by the Corporate Defendants in operating NHC HEALTHCARE/KENNETT, LLC.

110.    During Resident's residency at NHC HEALTHCARE/KENNETT, LLC, the Corporate Defendants negligently failed to provide and/or hire, supervise and/or retain staff capable of providing Resident with a clean, safe, and protective environment, and that, because of this failure, Resident suffered neglect, abuse, severe personal injuries, conscious pain and suffering, and deterioration of Resident's physical condition as further described above. Ultimately, Resident died because of this failure.

111.    The Corporate Defendants manage, operate, and direct the day-to-day operations of NHC HEALTHCARE/KENNETT, LLC and these Corporate Defendants are liable for this direct involvement in the operations of such NHC HEALTHCARE/KENNETT, LLC. These Corporate Defendants are therefore liable to the Plaintiff for the neglect of and injuries to Resident.

112.    NHC HEALTHCARE/KENNETT, LLC and these Corporate Defendants have been named as Defendants in this lawsuit for their individual and direct participation in the torts and causes of action made the basis of this lawsuit, having:

   a.   Chosen to disregard the duties and responsibilities which NHC HEALTHCARE/KENNETT, LLC, as a licensed nursing home, owed to the State of Missouri and its residents;

   b.   Created the dangerous conditions described by interfering with and causing NHC HEALTHCARE/KENNETT, LLC to violate Missouri statutes, laws and minimum regulations governing the operation of said nursing home;

   c.   Superseding the statutory rights and duties owed to nursing home residents by designing and mandating dangerous directives, policies, management, and day to day operation of NHC HEALTHCARE/KENNETT, LLC;

   d.   Caused the harm complained of herein; and

e.  Choosing to disregard the contractual obligations owed to the State of Missouri and the Federal Government to properly care for the residents in exchange for payment of funds for such care.

## COUNT I - (Wrongful Death v. All Defendants)

113.    Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

114.    This Count accrued after the August 28, 2015, effective date of the amendments to RSMo. § 538.210.1. *See Coover v. Moore*, 31 Mo. 574, 576 (Mo. 1862); *Cummins v. Kansas City Pub. Serv. Co.*, 66 S.W.2d 920, 929 (Mo. banc 1933); *Nelms v. Bright*, 299 S.W.2d 483, 487 (Mo. banc 1957); *Boland v. St. Luke's Health System, Inc.*, 471 NATIONAL HEALTH CORPORATION 3d 703 (Mo. 2015) (banc).

115.    At all times material hereto Resident was in a defenseless and dependent condition.

116.    As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care, and treatment.

117.    At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

118.    At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing facility.

119.    These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

120.    These duties required Defendants to have sufficient and qualified staff at NHC HEALTHCARE/KENNETT, LLC nursing home to ensure the proper care for, and treatment of all residents including Resident.

121.    These duties required Defendants to ensure that NHC HEALTHCARE/KENNETT, LLC's nurses and other staff were properly educated and trained regarding the care for, and treatment of all residents including Resident.

122.    These duties required Defendants to ensure that NHC HEALTHCARE/KENNETT, LLC was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

123.    Specifically, during their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence and carelessly by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

a.  Failing to adequately assess, monitor, document, treat, and respond to Resident's physical condition as well as Resident's skin condition;

b.  Failing to adequately assess Resident's risk of developing skin breakdown and pressure ulcers;

c.  Failing to have enough staff at the Facility to ensure Resident's needs were being met regarding skin care and pressure ulcer prevention;

d.  Failing to provide adequate assistive devices and interventions to prevent Resident's skin breakdown and pressure ulcers;

e. Failing to enact and carry out an adequate Care Plan regarding Resident's increased risk for skin breakdown and pressure ulcers;

f. Failing to provide adequate preventative skin care to Resident;

g. Failing to provide adequate assistance and assistive devices to prevent Resident's skin breakdown and pressure ulcers;

h. Failing to appropriately assess and maintain clean and dry skin where Resident developed a pressure ulcer;

i. Failing to turn and reposition Resident every two (2) hours;

j. Failing to utilize proper procedures for scheduling of turning and repositioning;

k. Failing to adequately assess, monitor, ensure, and document the administration of adequate nutrition and hydration to Resident;

l. Failing to document the measurement of Resident's wounds adequately and concisely for proper and efficient wound treatment, management, and progression;

m. Failing to prevent the development and worsening of Resident's pressure ulcers;

n. Failing to adequately, timely and consistently prevent, assess, and treat Resident's pressure ulcer;

o. Failing to have and/or implement appropriate policies and procedures regarding the prevention, assessment, and treatment of pressures ulcers in residents like Resident;

p. Failing to carry out and follow standing orders, instructions, and protocol regarding the prevention of Resident's skin breakdown and pressure ulcers;

q. Failing to ensure the nursing home was properly capitalized.

r. Failing to perform and measure up to the requisite standards of care required and observed by health care providers and further particulars presently unknown to Plaintiff, but which is verily believed and alleged will be disclosed upon proper discovery procedures during this litigation.

124. As a direct and proximate result of the individual and collective acts of negligence of Defendants as described above, Resident was harmed and suffered non-economic damages limited to death, pain, suffering, and mental anguish.

125.     As a direct and proximate result of the individual and collective acts of negligence of all Defendants as described above, Plaintiff, suffered non-economic damages limited to loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, and mental anguish.

WHEREFORE, Plaintiffs, prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, limited to the noneconomic damages described above.

**COUNT II - (Alter Ego v. Defendant NATIONAL HEALTHCARE CORPORATION)**

126.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

127.     For the purposes of this Count Defendant NATIONAL HEALTHCARE CORPORATION, are hereinafter referred to as the "Alter Ego Defendants".

128.     NHC HEALTHCARE/KENNETT, LLC ("Subsidiary) are so dominated by the Alter Ego Defendant that the Subsidiary is a mere instrument of the Alter Ego Defendant and are indistinct from the Alter Ego Defendants.

129.     In fact, the Subsidiary is controlled and influenced by the Alter Ego Defendant in that the Alter Ego Defendant exercised complete control and domination over the Subsidiary's finances and business practices.

130.     Specifically, the Alter Ego Defendant's complete control and domination over the Subsidiary caused NHC HEALTHCARE/KENNETT, LLC's undercapitalization and understaffing while Resident was at NHC HEALTHCARE/KENNETT, LLC.

131.    Upon information and belief, the Alter Ego Defendant's complete control and domination over the Subsidiary caused the Subsidiary to operate at a loss during the years of 2020 and 2021.

132.    Upon information and belief, the Alter Ego Defendant's complete control and domination over the Subsidiary caused the Subsidiary's liabilities to exceed its assets by during the years 2020 and 2021.  Specifically:

     a.   The Alter Ego Defendant own all or most of the capital stock of the Subsidiary;

     b.   The Alter Ego Defendant and the Subsidiary have common directors or officers;

     c.   The Alter Ego Defendant finance the Subsidiary;

     d.   The Alter Ego Defendant subscribe to all the capital stock of the Subsidiary;

     e.   The Alter Ego Defendant caused the incorporation of the Subsidiary;

     f.   NHC HEALTHCARE/KENNETT, LLC has grossly inadequate capital;

     g.   The Alter Ego Defendant pay the salaries and other expenses or losses of the Subsidiary;

     h.   The Alter Ego Defendant use the property of the Subsidiary as its own; and

     i.   The directors or executives of the Subsidiary do not act independently in the interest of the Subsidiary but take their orders from the Alter Ego Defendant in the latter's interest.

133.    According to NATIONAL HEALTHCARE CORPORATION: "Our principal business is the operation of skilled nursing facilities, assisted living facilities, independent living facilities, homecare and hospice agencies, and a behavioral health hospital. Our business activities include providing subacute and post-acute skilled nursing care, intermediate nursing care, rehabilitative care, memory and Alzheimer's care, senior living services, home health care services, hospice services, and behavioral health services."

134.     According to NATIONAL HEALTHCARE CORPORATION: "The most significant portion of our business and the base for our other health care services is the operation of our skilled nursing facilities ("SNF's"). In our facilities, experienced medical professionals provide medical services prescribed by physicians. Registered nurses, licensed practical nurses, and certified nursing assistants provide comprehensive, individualized nursing care 24 hours a day. In addition, our facilities provide licensed therapy services, quality nutrition services, social services, activities, and housekeeping and laundry services. Revenues from the 66 facilities we own or lease are reported as net patient revenues in our financial statements."

135.     According to NATIONAL HEALTHCARE CORPORATION: "Centers for Medicare and Medicaid Services ("CMS") introduced the Five-Star Quality Rating System to help consumers, their families and caregivers compare skilled nursing facilities more easily. The Five-Star Quality Rating System gives each skilled nursing operation a rating of between one and five stars in various categories (five stars being the best). The Company has always strived for patient-centered care and quality outcomes as precursors to outstanding financial performance."

136.     According to NATIONAL HEALTHCARE CORPORATION: "The Company has two reportable operating segments: (1) inpatient services, which includes the operation of skilled nursing facilities, assisted and independent living facilities, and the one behavioral health hospital, and (2) homecare and hospice services."

137.     According to NATIONAL HEALTHCARE CORPORATION: "In most of the communities in which we operate health care facilities, we compete with other health care facilities in the area. There are hundreds of operators of post-acute healthcare services in each of these states and no single operator, including us, dominates any of the markets, except for some small rural markets which might have limited competition. In competing for patients and staff, we depend upon referrals from acute care hospitals, physicians, residential care facilities, church groups and other community service organizations. The reputation in the community and the physical appearance of our facilities are important in obtaining patients since members of the patient's family generally participate to a greater extent in selecting skilled nursing facilities than in selecting an acute care hospital. We believe that by providing and emphasizing rehabilitative, as well as patient-centered healthcare services, we can broaden our patient base and to differentiate our operations from competing operations."

138.     According to NATIONAL HEALTHCARE CORPORATION: "As of December 31, 2021, we had 12,965 full-time and part-time employees ("partners") through our Administrative Services Contractor (National Health Corporation)."

139.     According to NATIONAL HEALTHCARE CORPORATION: "To attract and retain top talent, we believe we must offer and maintain competitive total rewards for our partners. These rewards include not only wages and salaries, but also health, welfare, and retirement benefits. Our partners accrue earned time off ("ETO") with the flexibility to use this time at their discretion. We offer comprehensive health insurance coverage to all eligible partners as well as a partner and family sick time program which allows partners to accrue paid sick time based on

hours worked and to use that time for themselves or family members in need of care. We offer a 401(k) plan which includes matching company contributions. Also, to foster a stronger sense of ownership, we offer an Employee Stock Purchase Plan where partners may purchase company stock through payroll deduction."

140.    According to NATIONAL HEALTHCARE CORPORATION: "We also conduct an "Administrator in Training" course, which is 24 months in duration, for the professional training of administrators. Presently, we have five (two female and three male) full-time individuals in this program. Both of our regional senior vice presidents, four regional vice presidents, one regional administrator, and 53 of our 75 health care center administrators are graduates of this program."

141.    According to NATIONAL HEALTHCARE CORPORATION: "We regularly utilize third-party consultants to conduct anonymous surveys to seek feedback from our partners on a variety of topics, including but not limited to, confidence in company leadership, competitiveness of our compensation and benefits package, career growth opportunities and improvements on how we can continue to make our company an employer of choice. The results are shared with our partners and reviewed by senior leadership, who analyze areas of progress or deterioration and prioritize actions and activities in response to this feedback to drive meaningful improvements in partner engagement."

142.    According to NATIONAL HEALTHCARE CORPORATION: "A primary area of management focus continues to be the rates of occupancy within our skilled nursing facilities. The overall census in owned and leased skilled nursing facilities for 2021 was 80.6% compared to 83.6% in 2020 and 90.3% in 2019."

143.    According to NATIONAL HEALTHCARE CORPORATION: "With the average length of stay decreasing for a skilled nursing patient, as well as the increased availability of assisted living facilities and home and community-based services, the challenge of maintaining desirable patient census levels has been amplified. Management has undertaken a number of steps in order to best position our current and future health care facilities. This includes working internally to examine and improve systems to be most responsive to referral sources and payors. Additionally, NHC is in various stages of partnerships with hospital systems, payors, and other post-acute alliances to better position ourselves so we are an active participant in the delivery of post-acute healthcare services."

144.    Thus, the Alter Ego Defendant used the corporate cloak of the Subsidiary as a subterfuge to defeat public convenience, to justify a wrong, and/or to perpetrate a fraud in that the Alter Ego Defendant's complete control and domination of the Subsidiary depleted all the Subsidiary's assets, thereby making it unable to pay a judgment resulting from its care of residents including Resident.

145.    This    undercapitalization    and    understaffing    violated    NHC HEALTHCARE/KENNETT, LLC's duties under 19 C.S.R. § 30-85.042 and the applicable standard  of  care  owed  by  a  nursing  home  operator  or  manager  to  NHC HEALTHCARE/KENNETT, LLC's residents.

146.    As a direct and proximate result of the individual and collective acts of negligence of the Subsidiary – and the Alter Ego Defendant – Resident was harmed and suffered non-economic damages limited to death, pain, suffering, and mental anguish.

147.    As a direct and proximate result of the individual and collective acts of negligence of the Subsidiary, – and the Alter Ego Defendant – Plaintiff, suffered non-economic damages limited to loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, and mental anguish.

WHEREFORE, Plaintiffs, prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, limited to the noneconomic damages described above.

### Count III - (The Estate's Negligence Claim for Pain and Suffering Not Resulting In Death Against All Defendants)

148.    Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows:

149.    Count III is brought in the alternative to the wrongful death claim.

150.    At all times material hereto Resident was in a defenseless and dependent condition.

151.    As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care, and treatment.

152.     At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

153.     At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing Facility.

154.     These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

155.     These duties required Defendants to have sufficient and qualified staff at the Facility to ensure the proper care for, and treatment of all residents including Resident.

156.     These duties required Defendants to ensure that the Facility's nurses and other staff were properly educated and trained regarding the care for, and treatment of all residents including Resident.

157.     These duties required Defendants to ensure that the Facility was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

158.     Specifically, during their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence and carelessly by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

a. Failing to adequately assess, monitor, document, treat, and respond to Resident's physical condition as well as Resident's skin condition;

b. Failing to adequately assess Resident's risk of developing skin breakdown and pressure ulcers;

c. Failing to have enough staff at the Facility to ensure Resident's needs were being met regarding skin care and pressure ulcer prevention;

d. Failing to provide adequate assistive devices and interventions to prevent Resident's skin breakdown and pressure ulcers;

e. Failing to enact and carry out an adequate Care Plan regarding Resident's increased risk for skin breakdown and pressure ulcers;

f. Failing to provide adequate preventative skin care to Resident;

g. Failing to provide adequate assistance and assistive devices to prevent Resident's skin breakdown and pressure ulcers;

h. Failing to appropriately assess and maintain clean and dry skin where Resident developed a pressure ulcer;

i. Failing to turn and reposition Resident every two (2) hours;

j. Failing to utilize proper procedures for scheduling of turning and repositioning;

k. Failing to adequately assess, monitor, ensure, and document the administration of adequate nutrition and hydration to Resident;

l. Failing to document the measurement of Resident's wounds adequately and concisely for proper and efficient wound treatment, management, and progression;

m. Failing to prevent the development and worsening of Resident's pressure ulcers;

n. Failing to adequately, timely and consistently prevent, assess, and treat Resident's pressure ulcer;

o. Failing to have and/or implement appropriate policies and procedures regarding the prevention, assessment, and treatment of pressures ulcers in residents like Resident;

p. Failing to carry out and follow standing orders, instructions, and protocol regarding the prevention of Resident's skin breakdown and pressure ulcers;

q. Failing to ensure the nursing home was properly capitalized.

r. Failing to timely transfer Resident to a Facility that could provide adequate care;

s.   Failing to properly supervise and train the employees, agents and/or servants of the Defendants who were responsible for the care and treatment of Resident;

t.   Failing to ensure the behavioral facilities was properly capitalized.

u.   Failing to perform and measure up to the requisite standards of care required and observed by health care providers and further particulars presently unknown to Plaintiff, but which is verily believed and alleged will be disclosed upon proper discovery procedures during this litigation.

159.   As a direct and proximate result of the Defendants' acts resulting in an understaffed and undercapitalized nursing home while Resident was at NHC HEALTHCARE/KENNETT, LLC, Resident was harmed and suffered non-economic damages limited to pain, suffering, and mental anguish.

WHEREFORE, Plaintiffs, prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, limited to the noneconomic damages described above.

## PLAINTIFF'S DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE

Respectfully Submitted,

STEELE CHAFFEE, LLC

By:   */s/ Jonathan Steele*
Jonathan Steele MO #63266
2345 Grand Boulevard, Suite 750
Kansas City, MO 64108
Ph: (816) 466-5947
Fax: (913) 416-9425
jonathan@nursinghomeabuselaw.com

ATTORNEYS FOR PLAINTIFF